NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO M.T.

No. 1 CA-JV 23-0005
FILED 7-11-2023

---

Appeal from the Superior Court in Maricopa County
JD27443
The Honorable Michael J. Herrod, Judge

**AFFIRMED**

---

COUNSEL

Law Office of Denise L. Carroll, Scottsdale
By Denise L. Carroll
*Counsel for Appellant Mother*

The Huff Law Firm, PLLC, Tucson
By Daniel R. Huff, Laura J. Huff
*Co-Counsel for Appellee Department of Child Safety*

Arizona Attorney General's Office, Mesa
By Emily M. Stokes
*Co-Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Judge Daniel J. Kiley delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge Jennifer M. Perkins joined.

---

**K I L E Y**, Judge:

¶1        Amanda Y. ("Mother") appeals the juvenile court's order terminating her parental rights to her child, M.T. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2        In March 2020, the Department of Child Safety ("DCS") removed M.T. from the care of her parents, Mother and Joshua T. ("Father"), after learning that they were abusing substances and lacked stable housing, instead living in an extended stay hotel. Father had sent M.T.'s paternal grandmother a text stating that he was going to sell M.T. so he could purchase fentanyl. After further investigation, DCS learned that Mother and Father had a long history of abusing substances, including marijuana, heroin, and other opiates; had untreated mental health concerns; and engaged in domestic violence in M.T.'s presence. DCS placed M.T. with the paternal grandparents. DCS then filed a petition alleging M.T. dependent as to Mother and Father due to their substance abuse, domestic violence, and inability to provide for M.T.'s basic needs.

¶3        In July 2020, Mother and Father failed to appear at the initial dependency hearing, and the court found M.T. dependent. Several months later, after reviewing a progress report noting that Mother continued to abuse substances and failed to engage in her case plan, the court changed the case plan to severance and adoption. DCS then moved to terminate Mother's rights to M.T. DCS later amended its motion to add out-of-home placement as an additional ground for termination.

¶4        M.T. was diagnosed with autism in January 2021, and DCS referred her for services. In November 2021, M.T. was placed in a Department of Development Disabilities foster home after her paternal grandparents asked DCS to "find a placement that was able and willing to meet all of [M.T.'s] needs as it had become overwhelming for them." M.T. receives multiple behavioral health and specialist services, including

2

dermatology, gynecology, neurology, and endocrinology services, in addition to occupational and speech therapy.

**¶5** DCS's safety plan recommended that Mother attend all of M.T.'s medical appointments; provide for M.T.'s daily needs; demonstrate a willingness to obtain safe, appropriate, and stable housing; maintain sobriety; seek and maintain employment; seek assessment for mental health concerns; undergo counseling for domestic violence; and engage in services.

**¶6** DCS offered Mother a variety of services, including participation in Family Connections,[1] supervised visits with M.T., drug testing, substance abuse assessment and treatment, transportation, psychological consultations, domestic violence counseling, and housing assistance. Mother participated in Family Connections, visited with M.T., and underwent drug testing, substance abuse treatment, and two psychological consultations. However, she did not attend M.T.'s appointments, complete counseling to address her domestic violence issues, obtain stable housing, or maintain employment.

**¶7** After a contested termination hearing held over four days in September and November 2022, the juvenile court terminated Mother's parental rights based on fifteen-months' out-of-home placement grounds after finding that termination was in M.T.'s best interests. Mother timely appealed. The superior court also terminated Father's parental rights; Father is not a party to this appeal. We have jurisdiction pursuant to A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

**¶8** Parents' rights to custody and control of their children, though fundamental, are not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). The juvenile court may terminate a parental relationship if it finds at least one statutory ground for termination under A.R.S. § 8-533(B) by clear and convincing evidence. Evidence is "clear and convincing" if it is "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284-85, ¶ 25 (2005) (citation omitted). The court

---

[1] Family Connections is a service that provided Mother with "resources and supports to assist Mother in making behavioral changes, obtaining social supports, locating family resources, learning coping skills, and ensuring general child well-being."

must also find, by a preponderance of the evidence, that termination is in the child's best interest. *Id.* at 284, ¶ 22.

## A. Statutory Grounds for Termination

**¶9**     The juvenile court may find grounds for termination of a parent-child relationship when the "child has been in an out-of-home placement for a cumulative total period of fifteen months or longer" if (1) the "parent has been unable to remedy the circumstances" that caused the out-of-home placement, and (2) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). In determining that a parent has been unable to remedy the circumstances causing the child to be in an out-of-home placement, we consider those circumstances existing at the time of the termination preventing the parent from appropriately providing for her child. *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22 (App. 2007); *see also Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 17, ¶ 26 (App. 2019) (noting that a court must consider "both the origin and any cause arising during the dependency").

**¶10**     "We review an order terminating a parent's relationship with his or her child . . . in the light most favorable to sustaining the superior court's ruling," *Calvin B. v. Brittany B.*, 232 Ariz. 292, 296, ¶ 17 (App. 2013), and we will affirm the trial court's findings of fact "if supported by adequate evidence in the record," *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 451-52, ¶ 19 (App. 2007) (quoting *State v. Smith*, 123 Ariz. 243, 247 (1979)).

**¶11**     Mother challenges the juvenile court's order terminating her parental rights, asserting that "the court's concern that the child was lingering in care for two years and eight months should not override the constitutional right guaranteed to a parent to be afforded the opportunity to complete the services that would help her reunify with her child." But "children should not be forced to wait for their parent to grow up." *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 17 (App. 2016) (citation omitted). And while DCS must "provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child," DCS is not required to "undertake rehabilitative measures that are futile," *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶¶ 34, 37 (App. 1999), nor is it required to "provide every conceivable service or to ensure that a parent participates in each service it offers," *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994).

**¶12**        Mother's opening brief largely focuses on the progress she made in addressing her substance abuse issues. But the court did not terminate Mother's parental rights on grounds of substance abuse. Rather, it relied on fifteen-months' out-of-home placement grounds, which considers, generally, "parental unfitness . . . that creates harm or risk of harm to the child." *Brionna J. v. Dep't of Child Safety*, 253 Ariz. 271, 277, ¶ 26 (App. 2022) (citation omitted).

**¶13**        During the dependency proceedings, Mother failed to address her mental health and domestic violence issues, which remain serious concerns. As the court found, Mother responds to "adversity" with "anger and violence." Although DCS referred Mother for individual counseling with a domestic violence component, Mother did not complete that counseling. Meanwhile, Mother's erratic behavior "escalat[ed]" over the course of the proceedings. Mother threatened Father and others involved in M.T.'s case, including M.T.'s foster placement ("the Placement"). Mother's visits with M.T. were moved to a secure facility after Mother stated that if her parental rights were severed, she would obtain a firearm and shoot the Placement, the parent aide, and then herself. Indeed, the Placement obtained an injunction against harassment ("IAH") against Mother in September 2022 after Mother followed her in her car as the Placement was driving away from the visitation facility. At trial, Mother accepted no responsibility for her actions on that occasion, claiming that the Placement "made up several lies" about her. The court was not, of course, required to accept Mother's denial that she engaged in the acts that led the Placement to seek and obtain the IAH. *See In re James P.*, 214 Ariz. 420, 425, ¶ 24 (App. 2007) ("The juvenile court is in the best position to assess witness credibility . . . ."). Ample evidence supports the court's determination that Mother "has not addressed her issues with domestic violence."

**¶14**        Mother has also failed to effectively address her homelessness and unemployment. At the time of trial, Mother was residing at a sober living house where M.T. could not live with her. Though she made attempts to find housing, she failed to secure stable housing that would be suitable for both her and M.T. Mother testified at the beginning of trial that she worked as a driver for Uber and Lyft using a car that she rented from an acquaintance for $1,000 per month but later admitted that she lost that employment when the car broke down and could not be repaired. And although Mother went on to testify that she intended to apply for a job at a Wendy's restaurant, Mother's history gives no reason to believe that she would be able to secure and maintain steady employment.

**¶15**      Evidence in the record supports the court's determination that Mother is incapable of taking care of M.T.'s special needs. Despite DCS's efforts to accommodate Mother, Mother was routinely late to visits with M.T. and never attended M.T.'s medical appointments. During supervised visits, Mother disregarded the healthy diet prescribed for M.T., instead offering the child "junk food," "Doritos," "cotton candy," and other "sugary items." During one visit, the parent aide observed Mother place a lollipop in M.T.'s mouth immediately after the child vomited.

**¶16**      The record overwhelmingly shows that Mother has been unable to remedy the circumstances that caused the out-of-home placement and will not be capable of providing proper parental care for M.T. in the near future. Accordingly, the court properly found that DCS had established grounds for termination under A.R.S. § 8-533(B)(8)(c).

## B.  Best Interests

**¶17**      Mother also argues that termination was not in M.T.'s best interests. Asserting that she "still wants to parent" M.T., Mother contends that she "has worked exceedingly hard to gain control of her life and break her addiction for fentanyl." "[I]t is not in [M.T.'s] best interests," Mother concludes, "to be severed from a birth mother who has worked so hard to reunify."

**¶18**      In determining what is in a child's best interests, a court "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148, ¶ 1 (2018). "[A] determination of the child's best interest must include a finding as to how the child would benefit from a severance or be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990).

**¶19**      The juvenile court may find that a child would benefit from termination if an adoption plan is in place or, at a minimum, that adoption is likely, *Titus S. v. Dep't of Child Safety*, 244 Ariz. 365, 371, ¶¶ 23-24 (App. 2018), and that the child "would benefit psychologically from the stability an adoption would provide," *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 352 (App. 1994). Conversely, the court may find a child would be harmed by the continuation of the parent-child relationship "where there is clear and convincing evidence of parental unfitness which has not been remedied . . . and which detrimentally affects the child's well-being." *Pima Cnty. Juv. Action No. S-2460*, 162 Ariz. 156, 158 (App. 1989).

¶20  Here, the juvenile court found that the Placement provides M.T. with "a loving and nurturing home environment." The court further found that the Placement "intends to proceed to adoption, which will provide [M.T.] with the added benefit of stability and permanency . . . [and] exposure to family." Moreover, the court found that maintaining the "parent-child relationship" here "would be detrimental to [M.T.] because [she] would linger in care for an extended period of time when she has already been in care for two and a half years."

¶21  The record supports the juvenile court's determination that, although Mother may have made progress in overcoming her fentanyl addiction over the course of the dependency proceedings, she is still "simply not ready to parent [M.T.]." The court did not err in finding that termination would be in M.T.'s best interests.

## CONCLUSION

¶22  We affirm.

